BOSTON PIANO & MUSIC CO. *v.* SECKINGER.

1. CONTRACTS—GAMBLING CONTRACTS—FRAUD—PUBLIC POLICY.
   A scheme for the sale of groceries as an incident to the
   giving of certificates in a so-called advertising campaign,
   which certificates, at the end of the period, are to be
   counted to determine which one of 100 candidates should
   have a piano and other various articles, and which scheme
   is part of a contract of sale of the prizes, is illegal.

2. SAME.
   A contract for the purchase of a piano and other articles
   to be used to put in operation a so-called advertising
   campaign by a merchant, including an illegal scheme for
   the furtherance of such campaign which is the induce-
   ment to the contract, is void and unenforceable.

Error to Washtenaw; Kinne, J. Submitted June
21, 1917. (Docket No. 102.) Decided September 27,
1917.

Assumpsit by the Boston Piano & Music Company
against Joseph E. Seckinger for goods sold and de-
livered. Judgment for defendant. Plaintiff brings
error. Affirmed.

*F. M. Freeman* (*Frank A. Stivers* and *Roscoe O.
Bonisteel*, of counsel), for appellant.

*A. J. Waters* (*A. J. Sawyer*, of counsel), for ap-
pellee.

FELLOWS, J. The defendant is engaged in the re-
tail grocery business at the village of Manchester,
Washtenaw county. On July 14, 1915, the agent of
plaintiff called upon him, and the result of such call
was a written order, or agreement, signed by defend-
ant for the purchase of a piano, 12 minor articles,
and the paraphernalia, literature, circulars, instruc-

tions, etc., necessary to put into operation and conduct a so-called advertising campaign, with the ultimate object of giving the piano and other articles away. The agreed purchase price was $465. It appears from the record that the piano and other 12 articles were worth $200, and we infer that the balance was for the scheme devised by plaintiff and the necessary paraphernalia for its operation. The goods were shipped and a book of instructions, literature, certificates and other necessary paraphernalia were sent. They were refused and later this action was brought, plaintiff counting in a special count on the contract, and also upon the common counts. The case was submitted to the jury, which rendered a verdict for the defendant, and plaintiff brings the case here.

We do not agree with plaintiff's counsel that this case belongs to that class of cases where a lawful article of commerce is afterwards used by the purchaser in an unlawful manner, or in violation of some statute, without the privity of the vendor, and where recovery is had, notwithstanding the unlawful use to which it is put by the purchaser. Here the scheme was a part of the consideration, and an inducement to the contract, and, so far as this particular question is concerned, this case is ruled by *La France* v. *Cullen,* 196 Mich. 726 (163 N. W. 101). It therefore becomes necessary to examine the scheme which the defendant contracted to purchase, together with the methods of its execution. The scheme contemplated that for quite an extended period, nearly a year, defendant should give to his customers certificates to be furnished him by the plaintiff. It contemplated the nomination of 100 candidates, each of whom would seek to get the largest amount of these certificates before the contest closed, with a view of obtaining a free piano. It contemplated the posting of the standing of the candidates weekly on a poster in defendant's store, the

keeping of all the candidates cheered up, and in the race until the last day. Briefly stated, it contemplated the abandonment of the old-fashioned method of selling groceries on their merits, and the substitution of a plan of selling groceries as an incident to giving the certificates, which, at the end of the period, would be counted to determine which one of the 100 candidates should have the piano, which the sparkling diamond weighing one-sixteenth of a carat, which the other minor prizes, and which 87 out of the 100 should get nothing. The contract, as a part of the consideration, required the delivery to defendant of:

"One book giving suggestions for starting the campaign, containing much valuable information and suggestions for starting the campaign, securing organizers and getting them enthusiastically at work, which the retailer may use as he prefers. Copyrighted."

This book was sent on and it appears in the record. To the unsophisticated and the uninitiated in the method of conducting these gift enterprises, it is an interesting production. While it is urged by plaintiff that it is only suggestive of the measures used in conducting these contests, and therefore need not be followed, still it furnished part of the consideration, contained the suggestion of the plaintiff, and was a part of the scheme, and its first admonition is as follows:

"*Dear Mr. Merchant:* This booklet is prepared for your special benefit. It is a personal message to you and contains some facts gained after long experience and as the result of hundreds of similar contests. Piano contests are our specialty, as understanding the quality of leather, flour, cloth, or any other line may be your specialty. We have spent a great deal of time and money in securing information of merchants pertaining to their methods of conducting their contest which resulted so successfully. Your contest can be the means of wonderfully increasing your business and bringing you a very liberal profit, or it can be

conducted in such a way that you will realize no returns from it. The important point is to get it started right; therefore, we say, study these instructions and have clerks study them. Every hour spent in studying our suggestions and carrying them out will mean a big profit to you." * * *

It is suggested that candidates be selected from the different nationalities, and from different locations, suggesting that "a popular school teacher makes a powerful contestant"; that lodges and churches be selected. In this connection the following suggestion is made:

"The same rule which applies to the country districts applies also to the city. There are the church circles, lodge circles, societies, the literary element, saloon element, and many more cliques or groups of people held together by some mutual interest. If the Methodist Sunday school can be enlisted in the work for the piano the entire Methodist church will help, and should no other church in the town enter, many of the people from other churches will pitch in and help."

Under the head "Be honest with them all" occurs the following:

"Should you find that a very strong lodge or church is interested be sure and nominate some other strong lodge or church to work with it. Don't let any one win too easily."

While under the head "How to honorably sustain and accelerate interest in the campaign," in some additional suggestions found in another exhibit, the following suggestion is made:

"When certain contestants seem to be running too far ahead it may be well to suggest to them that they had better not vote their certificates too fast, but hold some back, as it will cause others to work all the harder against them if they advance too rapidly. This is for the benefit of one or two who may be forging away ahead, but as a matter of fact, the others will

keep in the race longer and work harder if one or two do not get too far ahead. Should one get too far ahead, it is liable to discourage others, and the suggestion here given is to help avoid that condition. Quite often, however, the one who spurts ahead at the start is liable to lose interest later and drop out, and you must impress all with the idea that no one is sure of winning until the end and all have an equal chance." *  *  *

Printed circular letters were furnished to be sent the candidates informing them of their nomination, but not informing them that they have been nominated by the party conducting the contest. This letter states:

"*Dear Friend:* We are pleased to announce that you have been nominated a contestant in our piano advertising campaign, making it possible for you to become the happy possessor of the beautiful upright grand parlor piano now on exhibition in our store absolutely free of cost. This is a strictly high grade, standard instrument manufactured by a reputable factory, is warranted by the makers for a period of ten years, and bears their name on the name plate. It is an instrument of which any home may well be proud. We give free piano certificates to the amount of each purchase at our store, and the person holding the greatest amount of these certificates at the close of the campaign receives the piano entirely free of cost." *  *  *

Notwithstanding the statement in this letter that certificates are given to the amount of each purchase, after the candidates have been secured and the contest started, it was suggested:

"After the campaign is well started, give due bill cards to those who are behind to sell, showing them how they can get the extra certificates and greatly increase their standing in this way, while you get cash in advance for future trade. When you think it advisable tell them that if they will sell five $5 cards within a given time, say a week, you will give them

double certificates on them.   They now see an oppor-
tunity to get ahead and get busy and sell a large num-
ber of due bill cards, bringing cash to the store and
advancing their chances of winning." ▿

And it was further suggested:

"At the right time offer a bonus of from $10,000
to $25,000 as your judgment may dictate, to each con-
testant who doubles their standing during a given
time, say a week or a month, as circumstances may
direct.   This is an opportunity for the low ones to
make a gain, as they can double so much easier than
the high ones.   This plan has been used very suc-
cessfully for equalizing the standings of contestants,
and it is perfectly fair for all have the same oppor-
tunity.   Do you get the idea?"

Notwithstanding the representations to the can-
didates as to the conditions under which the certifi-
cates would be issued, made in the letter before re-
ferred to, sent for the purpose of inducing them to
enter the contest, the scheme contemplated, and the
paraphernalia for its execution was furnished, that at
some time during the contest it should be arranged
that certificates, in addition to those given at the time
of purchase, should be given to those agreeing to
trade at defendant's store.   These were called pledge
of patronage cards.   So if A. signed a pledge of pat-
ronage card, saying that he would trade $5 at defend-
ant's store within the next 30 days, he would be given
$5 in certificates.   If he went in the next day and
bought the $5 worth of goods he would be given $5
worth of certificates additional, making $10 worth of
certificates for his candidate on his $5 purchase.   The
candidates were not to be instructed, so far as this
record discloses, in the intricacy of this part of the
scheme, but were to be urged to get signed pledge
of patronage cards, as well as to "hump, hump, stead-
ily and continuously."   Another scheme, within the
scheme, and which changed the plan under which the

candidates entered, contemplated that some time after the contest was under way three times the amount of the purchase should be given in certificates through the disposal of undesirable and unsalable stock. This is the eleventh suggestion of the plaintiff found in Exhibit C. We quote from it:

"Make use of the yellow or green tag sale. Pick out such odds and ends of your stock as you wish to get rid of and place same in some convenient place. Tag those you wish to get rid of first with a yellow tag. On this tag will be found the following printed form: Yellow Tag Sale. Triple certificates will be given on goods marked with yellow tag. Price ———. Mark on each tag the price and attach it to the articles you wish to dispose of. The green tag printed in the same way, excepting it provides for double certificates, is used in the same way. The contestants buy goods so marked to get the additional certificates and urge their friends to do likewise. Some dealers put on a green tag sale first and later a yellow tag sale, while others use both kinds of tags for the same sale, marking the articles they wish to dispose of first with a yellow tag. Some dealers dispose of large quantities of dead, undesirable or unsalable stock in this way. The dealer must use his best judgment in all such matters, as well as matters in connection with his contest. It is usually best to conduct a yellow tag sale first and later put on a green tag.sale. The contestants who are hungry for certificates will gobble up lots of the goods with these tags to get the extra amount of certificates. It often occurs that large quantities of undesirable stock is disposed of in this way." * * *

It will be unnecessary to quote further from the literature of the plaintiff, or to further detail the scheme which defendant was expected to pay $265 for. Sufficient has been said to show the general character of the transaction and how the so-called advertising campaign was to be conducted.

Plaintiff's counsel is correct in his contention that the scheme is not a lottery, as that word has been

defined by this court in *People* v. *Elliott,* 74 Mich. 264 (41 N. W. 916, 3 L. R. A. 403, 16 Am. St. Rep. 640). In the distribution of the prizes one essential element of a lottery, that of chance, is lacking. But while it may not be a lottery it has all the vices, all the appeals to cupidity, all the seductiveness of a lottery, and more. Without recapitulating all of its vicious elements it will suffice to say that it contemplated obtaining the energy and the services of 100 candidates upon the representations that the piano would go to the one holding the largest amount in certificates at a given time; each dollar of certificates to represent a dollar of purchase at defendant's store; that notwithstanding this understanding with each candidate, defendant was to secretly give to certain of the candidates, those temporarily low, certificates which did not represent purchases at defendant's store, but which were a gratuity pure and simple; further, that by a manipulation of the pledge of patronage cards twice the amount of the purchases were issued in certificates to those knowing how to manipulate this part of the scheme, and further, that by the purchase of undesirable goods, three times the amount of the purchases in certificates were issued; further, that bonuses were to be given, all this to be done after the candidates had been induced to enter on the representation that a dollar certificate represented a dollar purchase, no less and no more. It contemplated that the public and candidates generally should understand that the true and correct standing of all candidates should be posted weekly; but that by a secret arrangement with the high candidates this notice posted in defendant's store should not speak the truth. It contemplated the arraying of class against class, church against church, lodge against lodge, locality against locality, nationality against nationality, the literary element against the saloon element, clique against

clique, in the mad scramble covering nearly a year, by 100 candidates for a cheap piano. We are asked to declare that this scheme is conducive to good morals. We decline to do so. It is infected with deception, freighted with artifice, and permeated with trickery. It is not a lottery, and has not even the respectability of the trading stamp scheme, which has been condemned as against good morals and the public welfare by the legislatures of many of the States of the Union, and which legislation has been sustained by the court of last resort of the Nation in the case to which we shall presently refer, although in the trading stamp scheme each holder of stamps of a stated value received some article of some value.

Nor can the scheme here involved be correctly called an advertising campaign. It is not advertising. It was said by Mr. Justice McKenna, speaking for the court in *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, 365 (36 Sup. Ct. 370, 377, L. R. A. 1917A, 421, Am. & Eng. Ann. Cas. 1917B, 455):

"It would be an endless task to cite cases in demonstration, and that the supplementing of the sale of one article by a token given and to be redeemed in some other article has accompaniments and effects beyond mere advertising the allegations of the bill and the argument of counsel establish. Advertising is merely identification and description, apprising of quality and place. It has no other object than to draw attention to the article to be sold, and the acquisition of the article to be sold constitutes the only inducement to its purchase. The matter is simple, single in purpose and motive; its consequences are well defined, there being nothing ulterior; it is the practice of old and familiar transactions and has sufficed for their success. The schemes of complainants have no such directness and effect. They rely upon something else than the article sold. They tempt by a promise of a value greater than that article and apparently not represented in its price, and it hence may be thought that thus by an appeal to cupidity

lure to improvidence. This may not be called in an exact sense a 'lottery,' may not be called 'gaming'; it may, however, be considered as having the seduction and evil of such, and whether it has may be a matter of inquiry, a matter of inquiry and of judgment that it is finally within the power of the legislature to make."

The scheme, which was a part and the essential part of the contract between these parties, was bad in morals and against public policy. The contract for its purchase was void and unenforceable. The court should have directed a verdict for the defendant for this reason.

The judgment is affirmed.

KUHN, C. J., and STONE and STEERE, JJ., concurred with FELLOWS, J. OSTRANDER, BIRD, MOORE, and BROOKE, JJ., concurred in the result.