STATE *v.* JOHN C. LINDSAY.

October Term, 1938.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed November 1, 1938.

*Maxwell L. Baton,* State's Attorney, for the State.

*Raymond L. Miles* and *John W. Redmond* (in municipal court only) for the respondent.

BUTTLES, J. This respondent was charged with the operation and maintenance of a lottery by means of certain acts set forth in the complaint. Trial by jury was had in Orleans municipal court with verdict of not guilty and judgment thereon and the State brings the case to this Court on exceptions.

Sec. 8683 of the Public Laws is found in the subdivision of Chapter 348 which is entitled "Lotteries" and reads as follows:

"Sec. 8683. SETTING UP, PROMOTING OR AIDING. A person who sets up or promotes a lottery for money or other property, or disposes of money or property by a lottery, and a person aiding or concerned in so doing, or who knowingly allows premises owned or occupied by him or under his control to be used for that purpose, or by persons raffling or using a game of chance for money or property, shall be fined not more than two hundred dollars."

The respondent is not accused of violating any other law than the statute above quoted. The State's brief contains the following statement of the facts, some of which were included in an agreed statement and the remainder shown by undisputed evidence:

The respondent, together with a Mr. Verdon and his wife, came to Newport the latter part of January, 1938. Their business was the setting up and managing of such campaigns as the one they proceeded to institute in Newport. The respondent solicited several merchants and business people in Newport and succeeded in getting twelve such persons to sign an agreement by the terms of which each of them agreed to pay the respondent the approximate sum of two hundred dollars, in return for which the respondent agreed to set up and promote the "Select Merchandise Campaign" or as it was later called the "Newport Select Merchandise Popularity Contest."

The campaign consisted of giving tickets or ballots to the several merchants and business men engaged therein, which they in turn gave to customers with a number of votes, so-called, written thereon, this number varying in proportion to the amount purchased at the usual retail price, ten votes being given for each one cent's worth of merchandise so purchased. The customer in turn wrote his name, or the name of any person not engaged in sponsoring or promoting the campaign, on the ballot and deposited the same in a box kept at each store for that purpose, the person whose name appeared on the ballot becoming thereby entitled to the indicated number of votes.

At intervals the ballots were collected from the several boxes by the respondent or his agents and taken to the contest headquarters where they were counted, the totals for each contestant as disclosed by such count being later posted at the stores participating in the contest. At the close of the contest the person who had received the greatest number of votes was to receive the first prize, which was a Plymouth automobile. Those having the second, third and fourth largest number of votes respectively were also to receive prizes.

It further appears that the several agreements between the respondent and the business men sponsoring the contest provided that the contest manager should have absolute charge of ballots, distribution of trade cards and all details covering the contest, and that from time to time the respondent gave out ballots in return for special services rendered in promoting the contest, for old papers and other junk delivered to him, for "free days" at the various stores and for special sales on stated days or sales of certain specified articles of merchandise. As the contest progressed the number of special votes so given out seems to have reached fantastic heights—20,000,000 votes, for instance, on a jar of cold cream at a specified special sale. It is stated in the State's brief that it was recognized at the start of the trial that the only real issue was whether or not the process of voting constituted the element of chance necessary to be a lottery.

The respondent has made no argument and has filed no brief. We are not thereby precluded, however, from considering any defense that he might have raised in order to sustain the judgment below. This court has many times held that a trial court may not be put in error on a point not made below. *Grapes* v. *Willoughby,* 93 Vt. 458, 460, 108 Atl. 421; *Chase Nat. Bank* v. *Healy,* 103 Vt. 495, 501, 156 Atl. 396. But an affirmance may be had on a ground first raised in this court. *Fairbanks* v. *Stowe,* 83 Vt. 155, 160, 74 Atl. 1006, 138 A. S. R. 1074; *Wood* v. *James,* 93 Vt. 36, 42, 102 Atl. 566; *Goupiel* v. *Grand Tr. Ry. Co.,* 94 Vt. 337, 344, 111 Atl. 346; *Temple Bros.* v. *Munnett,* 97 Vt. 395, 397, 123 Atl. 431; *Fernald & Co.* v. *Manley,* 99 Vt. 421, 422, 133 Atl. 247; *Residents of Royalton* v. *Central Vt. Ry. Co.,* 100 Vt. 443, 448, 138 Atl. 782; *Valenti* v. *Imperial Assur. Co.,* 107 Vt. 65, 70, 176 Atl. 413. And to affirm a judgment below it is not necessary that the point be raised in this Court. *Wood*

v. *James, supra*; *Temple Bros.* v. *Munnelt, supra*; *Fernald & Co.* v. *Manley, supra*; *Valenti* v. *Imperial Assurance Co., supra.*

█ In the recent case of *State* v. *Wilson,* 109 Vt. 349, 196 Atl. 757, this Court reiterated the definition of lottery that had been given in earlier cases, saying: "The word has no technical meaning distinct from its popular signification, and may be defined as a scheme whereby one or more prizes are distributed by chance among persons who have paid or promised a consideration for a chance to win them."

Our question here is merely whether the respondent's enterprise was a lottery, and not whether it was vicious or even illegal for other reasons. If it be assumed that the contest or campaign here under consideration was a scheme, that it contemplated the distribution of prizes to persons who had paid or promised to pay a consideration, we have remaining the question whether such prizes were to be distributed by chance.

█ The word chance is used in different senses. It is sometimes used as synonymous or nearly synonymous with opportunity. Obviously it is not so used in the definition of lottery. One definition given by Webster's New International Dictionary is: "An unforeseen or inexplicable cause or its operation; accident; as to happen by chance." This we think is the meaning of the word as here used. It is opposed to something which happens by plan or design, or by the exercise of volition or judgment. The casting of the votes for this candidate or that candidate was what determined the result, and the voting was a voluntary and designed act by the voter, who determined not only that he would vote but also for whom he would vote and the number of votes he would procure and cast. The act has no resemblance to the blind fate which is determined by the drawing of a number, the turning of a card or the spinning of a wheel. That there might have been fraud or sharp practice is beside the point. Such fraud or sharp practice, if shown, certainly would not tend to indicate that blind fate was the deciding factor in the contest.

In those jurisdictions where the question has arisen the prevailing opinion appears to be that schemes in which the award of prizes depended upon votes were not lotteries, inasmuch as no element of chance was involved in the distribution. *Quatsoe* v. *Eggleston,* 42 Ore. 315, 71 Pac. 66; *Nat. Sales Co.* v. *Manciet,*

83 Ore. 34, L. R. A. 1917D, 485, 162 Pac. 1055; *Commonwealth* v. *Jenkins,* 159 Ky. 80, 166 S. W. 794, Ann. Cas. 1915B, 170; *Brenard Mfg. Co.* v. *Jessup & Barrett Co.,* 186 Iowa, 872, 173 N. W. 101; *Dion* v. *St. John Baptiste Soc.,* 82 Me. 319, 19 Atl. 825; *Whitman* v. *Fournier,* 233 Mass. 154, 125 N. E. 303.

█ A scheme by which a merchant or association, on selling merchandise at regular prices, issues to purchasers ballots entitling them to express their choice a certain number of times, according to the price of articles bought, in favor of any person competing for prizes to be given to the persons receiving or holding the greatest number of votes, is not a "lottery." 38 C. J. 300, § 24; *Millsaps* v. *Urban,* 116 Ark. 90, 171 S. W. 1198; *Guy* v. *National City Bank,* 24 Ga. App. 281, 100 S. E. 648; *Boston Piano & Music Co.* v. *Seckinger,* 198 Mich. 312, 164 N. W. 263; *Leonard* v. *Pennypacker,* 85 N. J. Law, 333, 89 Atl. 26; *Conqueror Trust Co.* v. *Simmon,* 62 Okla. 252, 162 Pac. 1098.

The State cites a number of cases in which it was held in other jurisdictions that the distribution of prizes by means of votes was contrary to the particular statute involved. An examination of these cases discloses that in most of them at least the statute denounced not only lotteries but also gift enterprises so-called, or trading stamp schemes, or else the schemes were held to be generally contrary to public policy, a question which is not involved in this criminal prosecution. If there are any such cases in which, under circumstances similar to those in this case, a respondent was held guilty of violating a law similar to ours, covering only the setting up, promoting or aiding of lotteries, then we are unable to agree with the conclusion reached in those cases. Certainly the weight of authority, and, we think, the better reasoning are *contra.*

█ We hold that in the present case the State did not allege and prove facts sufficient to sustain a verdict of guilty had such verdict been rendered.

*Judgment affirmed.*